## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID COVINGTON, TANSY WILKERSON and DAISY SANTIAGO, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BIOGEN INC., BOARD OF DIRECTORS OF BIOGEN INC., THE RETIREMENT COMMITTEE, and JOHN DOES 1-30. Defendants. | ) ) ) ) ) |

**CIVIL ACTION NO.**:

**CLASS ACTION COMPLAINT**

## COMPLAINT

Plaintiffs, David Covington, Tansy Wilkerson and Daisy Santiago ("Plaintiffs"), by and through their attorneys, on behalf of the Biogen 401(k) Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.  As described in more detail below, in 2014 and part of 2015, the Plan was known as the Biogen Idec 401(k) Savings Plan.  The Plan was amended effective March 23, 2015 to change the name of the Plan to the Biogen 401(k) Savings Plan.  Both the Biogen Idec 401(k) Savings Plan and the Biogen 401(k) Savings Plan will be referred to collectively here as either the "Biogen 401(k) Savings Plan" or "the Plan."

Plan's fiduciaries, which include Biogen Inc.[2] ("Biogen" or "Company"), the Board of Directors

of Biogen ("Board") and its members during the Class Period and the Retirement Committee and

its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on

participating employees to incentivize saving for retirement.  As of the end of 2015, Americans

had approximately $6.7 trillion in assets invested in defined contribution plans.  *See* INVESTMENT

COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24,

2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015*

*Recordkeeping    Survey*    (June    2015),    available    at    http://www.plansponsor.com/2015-

Recordkeeping-Survey/.

3.      In a defined contribution plan, participants' benefits "are limited to the value of

their own investment accounts, which is determined by the market performance of employee and

employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).  Thus,

the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every

investment remains prudent, because all risks related to high fees and poorly-performing

investments are borne by the participants.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary

duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1).

These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 2020 WL

1495938, at * 6 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585,

---

[2] In 2014, Biogen Inc. was known as Biogen Idec Inc.  This name represented the 2013 merger
between Biogen Inc. and IDEC Pharmaceuticals Corporation.  In 2015, Biogen Idec Inc. changed
its name to Biogen Inc. Both Biogen Idec Inc. and Biogen Inc. will be referred to here collectively
as "Biogen" or "Company."

595 (8th Cir. 2009). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.     At all times during the Class Period (July 14, 2014 through the date of judgment) the Plan had at least 800 million dollars in assets under management. At the end of 2017 and 2018, the Plan had over one billion dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2018 audited financial statements of the Biogen 401(k) Savings Plan ("2018 Auditor Report") at 6. The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.     To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider available collective trusts as alternatives to the mutual funds in the Plan, despite their lower fees.

8.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

11.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

13.     Venue is proper in the Eastern Division because, pursuant to L.R., D. Mass. No. 40.1(d)(1)(C), Biogen is the only party residing in the District of Massachusetts and Biogen resides in Eastern Division.

### III.   PARTIES

**Plaintiffs**

14.     Plaintiff, David Covington ("Covington"), resides in Zublon, North Carolina. During his employment, Plaintiff Covington participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

15.     Plaintiff, Tansy Wilkerson ("Wilkerson"), resides in Brentwood, North Carolina. During her employment, Plaintiff Wilkerson participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

16.     Plaintiff, Daisy Santiago ("Santiago"), resides in Cary, North Carolina.  During her employment, Plaintiff Santiago participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

17.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties

and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  Plaintiffs did not and could not review the Committee meeting minutes (to the extent they exist) or other evidence of Defendants' fiduciary decision making, or the lack thereof.[3]  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

#### Company Defendant

19.     Biogen Inc. is the Plan sponsor with a principal place of business at 225 Binney Street, Cambridge, Massachusetts.  2018 Form 5500 on file with the United States Department of Labor ("2018 Form 5500") at 1.

20.     Biogen describes itself as "a global biopharmaceutical company focused on discovering, developing and delivering worldwide innovative therapies for people living with serious neurological and neurodegenerative diseases as well as related therapeutic adjacencies."

---

[3] Several months prior to filing the instant lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s).  Their request for meeting minutes was denied.  *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

2019 Form 10-K Statement filed with the United States Securities and Exchange Commission ("2019 10-K") at 1.  As of 2019, Biogen employed a "diverse, talented workforce, with more than 7,700 employees worldwide … ." The 2019 Annual Report of Biogen Inc. ("2019 Annual Report") at 1.  During 2019, Biogen "generated $14.4 billion in full-year total revenues … ." *Id* at 2.

21.     The Company is a fiduciary for several reasons.  First, it is identified as the Plan sponsor and administrator in the Plan's summary plan description.  Biogen 401(k) Savings Plan Summary Plan Description Effective January 1, 2020 ("2020 SPD") at 30. Biogen is further identified as the Plan administrator as follows: "Biogen Idec will be the Plan Administrator notwithstanding the appointment of one or more persons to perform the duties of the Plan Administrator." Biogen Idec 401(k) Savings Plan Document Effective January 1, 2014 as amended and restated ("2014 Plan Doc.") at 30.

22.     Second, Biogen, as the "Plan Administrator[,] may add or delete separate investment funds at its discretion, and in connection with the deletion of a separate investment fund may designate the successor investment fund … ." 2014 Plan Doc. at 16.

23.     Third, the Company appointed other Plan fiduciaries and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

24.     In particular, upon information and belief, Biogen, acting through its Board of Directors, appointed the Retirement Committee which "will track fund performance on a regular basis and complete a comprehensive review of the investment options annually." Biogen Inc. 401(k) Saving Plan Investment Policy Statement ("IPS") at 4.

25.     Further, Biogen, acting through its Board of Directors, appoints the Plan trustee. 2014 Plan Doc. at 28. The Plan trustee "is responsible for holding the assets of the trust fund according to the participants' and the Company's directions and for distributing Plan payments."

2020 SPD at 31. Throughout the Class Period, the Plan trustee was Fidelity Management Trust Co. *Id.*

26. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

27. The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions, including monitoring the activities of the Committee. Upon information and belief, Biogen, acting through its Board of Directors, appointed the Retirement Committee which "will track fund performance on a regular basis and complete a comprehensive review of the investment options annually." IPS at 4.

28. Further, Biogen, acting through its Board of Directors, appoints the Plan trustee. 2014 Plan Doc. at 28. The Plan trustee "is responsible for holding the assets of the trust fund according to the participants' and the Company's directions and for distributing Plan payments." 2020 SPD at 31. Throughout the Class Period, the Plan trustee was Fidelity Management Trust Co. *Id.*

29. Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee and Trustee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

30. The unnamed members of the Board of Directors for Biogen during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

31.     The Committee had discretionary authority to select, and accordingly, the fiduciary duty to prudently select and monitor Plan investments.  The Retirement Committee "will track fund performance on a regular basis and complete a comprehensive review of the investment options annually."  IPS at 4.

32.     The IPS requires that the Committee's annual review include a review of several factors.  These factor include, but, are not limited to, the following for each fund: "[its] historical risk and return results; [a]ny changes in process, philosophy, investment style, etc.; [f]und management fees; [a]ny significant changes in fund value and/or cash inflows/outflows to the fund; [a]ny changes to Morningstar and/or Lipper ratings; [p]lan Trustee(s) management … ." *Id.*

33.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

35.     To the extent that there are additional officers, employees and/are contractors of Biogen who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Biogen officers, employees and/or contractors who are/were

fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    THE PLAN

36.    The Plan "was established effective January 1, 1989." 2018 Auditor Report at 7. The Plan is "for the exclusive benefit of Participants and their Beneficiaries." 2014 Plan Doc. at 1. The Plan has been amended and restated several times since its inception.  Two of the most notable amendments will be discussed below.  First, the January 1, 2008 amendment provided for certain "full vesting of all participant accounts." *Id.*  Second, the March 23, 2015 amendment changed the name of the Plan from "the Biogen Idec 401(k) Savings Plan to the Biogen 401(k) Savings Plan" after the merger of Biogen and IDEC Pharmaceuticals Corporation.   First Amendment to the January 1, 2014 Amended and Restated Plan Document ("2015 Amended Plan Doc.") at 1.

37.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  IPS at 2.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

*38.*    "Participation in the Plan is voluntary and no Employee will be required to participate.  Each Employee in the eligible class who has attained the age 21 will be eligible to make savings deposits." 2014 Plan Doc. at 4.

### *Contributions*

39.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  2020 SPD at 8 and 9.

40.     With regard to employee pre-tax contributions, participants may "elect to save 1% to 40% of [their] Eligible Pay on a pre-tax basis (before federal, state and local income taxes are withheld) … ." 2020 SPD at 4.  Participants may also elect to contribute between "1% to 40% of [their] Eligible Pay on an after-tax basis (after federal, state and local income taxes are withheld). *Id.* Participants 50 years of age and older may, under certain circumstances, "elect to make an additional "catch-up" contribution each pay period up to a total catch-up contribution limit established by the IRS … ." *Id.*

41.     Biogen will "contribute $2 for each $1 of Pre-tax Contributions you contribute, up to 3% of your Eligible Pay, for a maximum Matching Contribution of 6% of Eligible Pay … ." *Id*.

42.     Like other companies that sponsor 401(k) plans for their employees, Biogen enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

43.     Biogen also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover."  *See*  https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

44.     Given the size of the Plan, Biogen likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

45.     Any employee who was "actively employed by the Company on January 1, 2008 or later, [is] automatically 100% vested in the Company's contributions." 2020 SPD at 18.  If an employee's "service with the Company was terminated prior to January 1, 2008, Company contributions are subject to your years of vesting service." *Id.*  An employee is "always 100% vested in [their] own contributions to the Plan." *Id.*

### *The Plan's Investments*

46.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, "[e]ach Participant will direct the separate investment fund or funds into which contributions by him or on his behalf … will be invested." 2014 Plan Doc at 17.  A Plan participant "must decide how to invest [their] contributions in 1% increments.  If [they] do not select any investment options, all of your contributions will be invested in the Company-designated qualified default investment alternative ("QDIA")." 2020 SPD at 6.  As noted above, the Committee, selects the investment funds that the Plan participants invest in.  IPS at 4.

47.     The Plan's assets under management for all funds as of December 31, 2018 was over one billion dollars.  *Id.* at 4.

## V.     CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between July 14, 2014 through the date of judgment (the "Class Period").

49.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 lists 6,720 Plan "participants with account balances as of the end of the plan year."  2018 From 5500 at p. 2.

50.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

51.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

52.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

53.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

54.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   DEFENDANTS' FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

55.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

56.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

57.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

58.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These

twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the law." *Braden,* 588 F.3d at 595.

59.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

60.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

61.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig.*

*II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S.*

*Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

62. In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by

co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances: (A) if he
> participates knowingly in, or knowingly undertakes to conceal, an
> act or omission of such other fiduciary, knowing such an act or
> omission is a breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his
> specific responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or (C) if he
> has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

63. During the Class Period, Defendants did not act in the best interests of the Plan

participants. Investment fund options chosen for a plan should not favor the fund provider over

the plan's participants. Yet, here, to the detriment of the Plan and their participants and

beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund

investments that were more expensive than necessary and otherwise were not justified on the basis

of their economic value to the Plan.

64. Based on reasonable inferences from the facts set forth in this Complaint, during

the Class Period Defendants failed to have a proper system of review in place to ensure that

participants in the Plan were being charged appropriate and reasonable fees for the Plan's

investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate

for (1) lower expense ratios for certain investment options maintained and/or added to the Plan

during the Class Period and (2) lower recordkeeping and administrative fees.

65.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.    SPECIFIC ALLEGATIONS

### A.    Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

66.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

67.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned

over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

68.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although 401(k) accounts may be fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

69.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties.  *See "A Look at 401(k) Plan Fees," supra*.

70.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."  *Id.* at 5.

71.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.     Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

72.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

73.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 135 S. Ct. at 1823.  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

74.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

75.     When large plans, particularly those with a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a

careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

76.    The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

77.    During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

78.    The funds in the Plan have stayed relatively unchanged since 2014.  Taking 2018 as an example year, a significant percentage of funds in the Plan (at least 14 out of 29 or more than 48%) were much more expensive than comparable funds found in similarly sized plans (plans having between $500 million and $1 billion in assets).  Plaintiffs conservatively compare the Plan to plans with assets between 500 million and 1 billion dollars.  In 2017 and 2018, the Plan had over 1 billion in assets under management.  Therefore, the appropriate comparison would be to plans with over 1 billion dollars in assets for those years.  Comparing the ICI medians for plans with over 1 billion dollars, 19 of the Plan's 29 funds, *or more than 65%,* would have higher expense ratios than the median expense ratios.

79.     Even with the more conservative approach, the expense ratios for funds in the Plan in some cases were up to up to *164*% (in the case of JHancock Disciplined Value Mid Cap A) and

**128%** (in the case of the MFS New Discovery R6) above the median expense ratios in the same category: [5]

| Fund in Plan | Exp Ratio[6] | Investment Style | ICI Median[7] |
|---|---|---|---|
| Fidelity Freedom 2040 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2035 | 0.73 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2045 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2030 | 0.69 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2050 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2055 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2060 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Equity-Income | 0.61 % | Domestic Equity | 0.42% |
| T. Rowe Price Diversified Mid Cap Gr | 0.83 % | Domestic Equity | 0.42% |
| MainStay Large Cap Growth I | 0.73 % | Domestic Equity | 0.42% |
| JHancock Disciplined Value Mid Cap A | 1.11 % | Domestic Equity | 0.42% |
| Fidelity Puritan | 0.53 % | Non-target date balanced | 0.40% |
| MFS New Discovery R6 | 0.96 % | Domestic Equity | 0.42% |
| Columbia Dividend Income I | 0.59% | Domestic Equity | 0.42% |

---

[5] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf

[6]  The listed expense ratios are taken from summary prospectuses published in 2019.

[7] This median fee is taken from plans with between $500 million and $1 billion in assets.

80.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans with between 500 million and 1 billion in assets was 0.52% using 2015 data compared with 0.42% in 2016.  Accordingly, the median expense ratios in 2020, or for that matter 2019, utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

81.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Utilize Lower Fee Share Classes*

82.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

83.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large

plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

84.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

85.     As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.  The chart below uses 2020 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund | Current ER | Identical Lower Share Class Fund | Identical Lower Cost Fund ER | Excess |
|---|---|---|---|---|
| Fidelity Freedom 2040 | 0.75 % | FHTKX<br>Fidelity Freedom 2040 K6[8] | 0.50 % | 50.0% |
| Fidelity Freedom 2035 | 0.73 % | FWTKX<br>Fidelity Freedom 2035 K6 | 0.49 % | 49.0% |

---

[8] At some time in 2019, the Plan switched from Fidelity Freedom target date funds to the K shares of the identical target date fund. The K6 share referenced in this chart, is still .15% less expensive than the K share. A prudent fiduciary would have moved to the K6 share class.

| Current Fund | Current ER | Identical Lower Share Class Fund | Identical Lower Cost Fund ER | Excess |
|---|---|---|---|---|
| Fidelity Freedom 2045 | 0.75 % | FJTKX<br>Fidelity Freedom 2045 K6 | 0.50 % | 50.0% |
| Fidelity Freedom 2030 | 0.69 % | FGTKX<br>Fidelity Freedom 2030 K6 | 0.47 % | 46.8% |
| Fidelity Freedom 2050 | 0.75 % | FZTKX<br>Fidelity Freedom 2050 K6 | 0.50 % | 50.0% |
| Fidelity Freedom 2025 | 0.65 % | FDTKX<br>Fidelity Freedom 2025 K6 | 0.45 % | 44.4% |
| Fidelity Freedom 2020 | 0.60 % | FATKX<br>Fidelity Freedom 2020 K6 | 0.43 % | 39.5% |
| Fidelity Freedom 2055 | 0.75 % | FCTKX<br>Fidelity Freedom 2055 K6 | 0.50 % | 50.0% |
| Fidelity Freedom 2010 | 0.52 % | FOTKX<br>Fidelity Freedom 2010 K6 | 0.39 % | 33.3% |
| Fidelity Freedom 2060 | 0.75 % | FVTKX<br>Fidelity Freedom 2060 K6 | 0.50 % | 50.0% |
| Fidelity Freedom 2015 | 0.56 % | FPTKX<br>Fidelity Freedom 2015 K6 | 0.41 % | 36.6% |
| Fidelity Equity-Income | 0.61 % | FEIKX<br>Fidelity Equity-Income K | 0.51 % | 19.6% |
| T. Rowe Price Diversified Mid Cap Gr | 0.83 % | RPTTX<br>T. Rowe Price Diversified Mid Cap Gr I | 0.69 % | 20.3% |
| MainStay Large Cap Growth I | 0.73 % | MLRSX<br>MainStay Large Cap Growth R6 | 0.64 % | 14.1% |

| Current Fund | Current ER | Identical Lower Share Class Fund | Identical Lower Cost Fund ER | Excess |
|---|---|---|---|---|
| JHancock Disciplined Value Mid Cap A | 1.11 % | JVMRX JHancock Disciplined Value Mid Cap R6 | 0.76 % | 46.1% |
| Fidelity Puritan | 0.53 % | FPUKX Fidelity Puritan K | 0.45 % | 17.8% |
| Fidelity Freedom Income | 0.47 % | FYTKX Fidelity Freedom Income K6 | 0.37 % | 27.0% |

86.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

87.     Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).  The individual fund and combined funds assets under management easily qualified them for lower share classes.  The following is a sampling of the assets under management as of the end of 2018:

| Current Fund | Category | Assets Under Management |
|---|---|---|
| FFFFX Fidelity Freedom 2040 | Target-date Fund | $75,187,565 |

| Current Fund | Category | Assets Under Management |
|---|---|---|
| FFTHX<br>Fidelity Freedom 2035 | Target-date Fund | $48,673,332 |
| FFFGX<br>Fidelity Freedom 2045 | Target-date Fund | $48,239,860 |
| FFFEX<br>Fidelity Freedom 2030 | Target-date Fund | $44,365,251 |
| FFFHX<br>Fidelity Freedom 2050 | Target-date Fund | $35,398,274 |
| FFTWX<br>Fidelity Freedom 2025 | Target-date Fund | $19,930,727 |
| FFFDX<br>Fidelity Freedom 2020 | Target-date Fund | $17,932,346 |
| FDEEX<br>Fidelity Freedom 2055 | Target-date Fund | $10,392,008 |
| FFFCX<br>Fidelity Freedom 2010 | Target-date Fund | $2,833,896 |
| FDKVX<br>Fidelity Freedom 2060 | Target-date Fund | $2,167,203 |
| FFVFX<br>Fidelity Freedom 2015 | Target-date Fund | $1,170,342 |
| FEQIX<br>Fidelity Equity-Income | Domestic Equity | $95,212,003 |
| PRDMX<br>T. Rowe Price Diversified Mid Cap Gr | Domestic Equity | $69,688,270 |
| MLAIX<br>MainStay Large Cap Growth I | Domestic Equity | $48,751,066 |
| JVMAX<br>JHancock Disciplined Value Mid Cap A | Domestic Equity | $36,318,155 |
| FPURX<br>Fidelity Puritan | Non-target date balanced | $27,890,719 |
| FFFAX<br>Fidelity Freedom Income | Target Date | $2,516,645 |

88.     Additionally, many of the lower share alternatives were available prior to the start of the Class Period.   By August 2017, all the lower share alternatives were available.  Specifically, Fidelity's K6 shares came to the market on June 7, 2017.  Generally, "K6 Funds and Class K are available to retirement plans recordkept at Fidelity [like the Plan here]." Fidelity Pricing at 3.  "K6 Funds are intended for plan sponsors that do not want to receive any revenue sharing or recordkeeping offsets." *Id.*

89.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

90.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  This is especially relevant in this action given that Fidelity was the Plan's recordkeeper.  Thus, Defendants have no reasonable excuse for not knowing about the immediate availability of the lower Fidelity share classes. Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

91.     It is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble III*, 2017 WL 3523737, at * 8.  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.* at * 11.  This lack of exercising basic fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were unreasonably high as discussed below.  A

fiduciary's task is to negotiate and/or obtain reasonable fees for investment options and recordkeeping/administration fees independent of each other if necessary.

92.     By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### *Failure to Investigate Availability of Lower Cost Collective Trusts*

93.     Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

94.     As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law.  *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."  Restatement (Third) of Trusts § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

95.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.  Defendants knew this, or at least should have known this,

because each year, the Plan had about two hundred million dollars invested in three Fidelity collective trusts: (1) Fidelity Growth Company Commingled Pool; (2) Fidelity Diversified International Commingled Pool; and (3) Fidelity Low-Priced Stock Commingled Pool.

96.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

97.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[9]  Indeed, as of 2012, among plans over $1 billion in size, more assets were

---

[9] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

held in collective trusts than in mutual funds.  *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

98.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts in addition to those the Plan had already selected.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.  Here, the following Fidelity funds in the Plan were available as collective trusts the entire Class Period with the exception of the FIAM Blend Target Date 2060 Q Fund which was not available until May 15, 2015:

| Fund in Plan | Exp. Ratio[10] | Collective Trust Version | Incep Date | Exp. Ratio[11] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2005 Fund | 0.48% | FIAM Blend Target Date 2005 Q Fund | Oct. 31 2007 | 0.32% | 31% |
| Fidelity Freedom 2010 Fund | 0.52% | FIAM Blend Target Date 2010 Q Fund | Oct. 31 2007 | 0.32% | 63% |
| Fidelity Freedom 2015 Fund | 0.56% | FIAM Blend Target Date 2015 Q Fund | Oct. 31 2007 | 0.32% | 75% |
| Fidelity Freedom 2020 Fund | 0.60% | FIAM Blend Target Date 2020 Q Fund | Oct. 31 2007 | 0.32% | 88% |
| Fidelity Freedom 2025 Fund | 0.65% | FIAM Blend Target Date 2025 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom 2030 Fund | 0.69% | FIAM Blend Target Date 2030 Q Fund | Oct. 31 2007 | 0.32% | 116% |

[10] The listed expense figures are as of 2019.

[11] The listed expense figures are as of 2019.

| Fund in Plan | Exp. Ratio[10] | Collective Trust Version | Incep Date | Exp. Ratio[11] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2035 Fund | 0.73% | FIAM Blend Target Date 2035 Q Fund | Oct. 31 2007 | 0.32% | 128% |
| Fidelity Freedom 2040 Fund | 0.75% | FIAM Blend Target Date 2040 Q Fund | Oct. 31 2007 | 0.32% | 134% |
| Fidelity Freedom 2045 Fund | 0.75% | FIAM Blend Target Date 2045 Q Fund | Oct. 31 2007 | 0.32% | 134% |
| Fidelity Freedom 2050 Fund | 0.75% | FIAM Blend Target Date 2050 Q Fund | Oct. 31 2007 | 0.32% | 134% |
| Fidelity Freedom K 2055 Fund | 0.75% | FIAM Blend Target Date 2055 Q Fund | July 12 2011 | 0.32% | 134% |
| Fidelity Freedom K 2060 Fund | 0.75% | FIAM Blend Target Date 2060 Q Fund | May 15 2015 | 0.32% | 134% |

99.    The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

100.    As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  Here, "[t]he eligibility requirement for FIAM Blend Target Date is $25 million in client assets."  *See* Fidelity Pricing Options for Retirement Plans as of Dec. 31, 2019 ("Fidelity Pricing"), p. 11.  And, "[c]lient assets is defined as assets invested in qualified defined contribution plans only, which are profit sharing, 401(k), and defined benefit plans that are qualified under Section 401(a) and governmental plans that are described in section 401(a)24 of the IRS code."  *Id.*

101.    Clearly,  the Plan had sufficient assets under management during the Class Period to qualify for Fidelity Freedom target date collective trusts.

102.    Given that the collective trusts were comprised of the same underlying investments as their mutual fund counterparts, and managed by the same investment manager, but had lower fees, they generally had greater returns when looking at the 1, 3, 5, and 10 year average annual returns.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive funds; the only consequence was higher costs for Plan participants. Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with Fidelity to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

103.    The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts in the same investment style of mutual funds in the Plan. Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts, but Defendants again failed to investigate this option.

104.    In summary, by failing to investigate the availability of certain collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

**_Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds_**

105.    As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1).

106.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See*

Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

107.   Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

108.   During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

109.   The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  The chart below uses 2019 expense ratios

as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[12] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2040 | 0.75 % | FBIFX Fidelity Freedom Index 2040 Investor | 0.12 % | Target-date Fund | 525.00% |
| | 0.75 % | RFGTX American Funds 2040 Trgt Date Retire R6 | 0.38 % | | 97.37% |
| Fidelity Freedom 2035 | 0.73 % | FIHFX Fidelity Freedom Index 2035 Investor | 0.12 % | Target-date Fund | 508.33% |
| | 0.73 % | RFFTX American Funds 2035 Trgt Date Retire R6 | 0.37 % | | 97.30% |
| Fidelity Freedom 2045 | 0.75 % | FIOFX Fidelity Freedom Index 2045 Investor | 0.12 % | Target-date Fund | 525.00% |
| | 0.75 % | RFHTX American Funds 2045 Trgt Date Retire R6 | 0.38 % | | 97.37% |
| Fidelity Freedom 2030 | 0.69 % | FXIFX Fidelity Freedom Index 2030 Investor | 0.12 % | Target-date Fund | 475.00% |

---

[12] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). Where only one fund is listed, index funds are identified by the word "index" following the fund name. Actively managed funds don't have this designation.

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[12] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | 0.69 % | RFETX American Funds 2030 Trgt Date Retire R6 | 0.35 % | | 97.14% |
| Fidelity Freedom 2050 | 0.75 % | FIPFX Fidelity Freedom Index 2050 Investor | 0.12 % | Target-date Fund | 525.00% |
| | 0.75 % | RFITX American Funds 2050 Trgt Date Retire R6 | 0.39 % | | 92.31% |
| Fidelity Freedom 2025 | 0.65 % | FQIFX Fidelity Freedom Index 2025 Investor | 0.12 % | Target-date Fund | 441.67% |
| | 0.65 % | RFDTX American Funds 2025 Trgt Date Retire R6 | 0.33 % | | 96.97% |
| Fidelity Freedom 2020 | 0.60 % | FPIFX Fidelity Freedom Index 2020 Investor | 0.12 % | Target-date Fund | 400.00% |
| | 0.60 % | RRCTX American Funds 2020 Trgt Date Retire R6 | 0.31 % | | 93.55% |
| Fidelity Freedom 2055 | 0.75 % | FDEWX Fidelity Freedom Index 2055 Investor | 0.12 % | Target-date Fund | 525.00% |
| | 0.75 % | RFKTX American Funds 2055 Trgt Date Retire R6 | 0.40 % | | 87.50% |

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[12] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2010 | 0.52 % | FKIFX Fidelity Freedom Index 2010 Investor | 0.12 % | Target-date Fund | 333.33% |
| | | | | | |
| Fidelity Freedom 2060 | 0.75 % | FDKLX Fidelity Freedom Index 2060 Investor | 0.12 % | Target-date Fund | 525.00% |
| | 0.75 % | RFUTX American Funds 2060 Trgt Date Retire R6 | 0.41 % | | 82.93% |
| | | | | | |
| Fidelity Freedom 2015 | 0.56 % | FLIFX Fidelity Freedom Index 2015 Investor | 0.12 % | Target-date Fund | 366.67% |
| | 0.56 % | RFJTX American Funds 2015 Trgt Date Retire R6 | 0.31 % | | 80.65% |
| | | | | | |
| Fidelity Freedom 2005 | 0.48 % | FJIFX Fidelity Freedom Index 2005 Investor | 0.12 % | Target-date Fund | 300.00% |
| | | | | | |
| Fidelity Equity-Income | 0.61 % | VMVLX Vanguard Mega Cap Value Index Instl | 0.06 % | Domestic Equity | 916.67% |
| | 0.61 % | VEIRX Vanguard Equity-Income Adm | 0.18 % | | 238.89% |
| | | | | | |
| T. Rowe Price Diversified Mid Cap Gr | 0.83 % | DBMYX BNY Mellon Sm/Md Cp Gr Y | 0.65 % | Domestic Equity | 27.69% |
| | | | | | |

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[12] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| MainStay Large Cap Growth I | 0.73 % | JLGMX JPMorgan Large Cap Growth I | 0.44% | | 65.91% |
| Dodge & Cox Income | 0.42 % | VBILX Vanguard Interm-Term Bond Index Adm | 0.07 % | Domestic Bond | 500.00% |
| | 0.42 % | JIBFX Johnson Institutional Core Bond | 0.25 % | | 68.00% |
| JHancock Disciplined Value Mid Cap A | 1.11 % | FLPKX   Fidelity Low-priced Stock K | 0.43 % | Domestic Equity | 158.14% |
| Vanguard Explorer Adm | 0.34 % | VSGAX Vanguard Small Cap Growth Index Admiral | 0.07 % | Domestic Equity | 385.71% |
| MFS New Discovery R6 | 0.96 % | DBMYX BNY Mellon Sm/Md Cp Gr Y | 0.65 % | Domestic Equity | 47.69% |
| Fidelity Freedom Income | 0.47 % | FIKFX Fidelity Freedom Index Income Investor - | 0.12 % | Target Date | 291.67% |
| | 0.47 % | RBAGX American Funds Moderate Growth & Inc R6 | 0.37 % | | 27.03% |
| American Funds Europacific Growth R6 | 0.49 % | VWILX Vanguard International Growth Adm | 0.32 % | Int'l Equity | 53.13% |
| | 0.48 % | VIVIX Vanguard Value Index I | 0.04 % | Domestic Equity | 1100.00% |

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[12] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Low-Priced Stock **Commingled Pool** | 0.48 % | VEIRX Vanguard Equity-Income Adm | 0.18 % | | 166.67% |
| | | | | | |
| Fidelity Diversified International **Commingled Pool** | 0.58 % | VWILX Vanguard International Growth Adm | 0.32 % | | 81.25% |

110.    The above alternative funds had better performances than the Plan's funds in their 3 and 5 year average returns as of 2020.   Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

111.    A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

112.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.   The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

113.    Additionally, with regard to this case in particular, the Plan's fiduciaries cannot justify selecting actively-managed funds over passively-managed ones.   As noted *supra*, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund in the short term, they rarely do so over a longer term.   In this case, there is objective evidence that selection of actively-managed funds over passively-managed ones with materially similar characteristics was unjustified.   Comparing the five-year returns of some of the Plan's top (by asset amount) actively-managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that, accounting for risk and fees paid, the actively-managed

funds lagged behind in performance.  The chart below indicates the efficiency, or lack thereof, of the active funds (*i.e.*, the return needed by the actively-managed fund, taking risk factors into account, to match the returns of the passively-managed fund):

| Fund Name/Comparator | Exp Ratio[13] | Return (5 Yr.) | Return Deficiency |
|---|---|---|---|
| Fidelity Freedom 2040 | 0.75 | 6.98 | Fails Efficiency Requires 1.4% more return to pass. |
| Fidelity Freedom Index 2040 Investor | 0.12 | 7.6 | |
| | | | |
| Fidelity Freedom 2035 | 0.72 | 7.09 | Fails Efficiency Requires 1.33% more return to pass. |
| Fidelity Freedom Index 2035 Investor | 0.12 | 7.67 | |
| | | | |
| Fidelity Freedom 2045 | 0.75 | 6.98 | Fails Efficiency Requires 1.41% more return to pass. |
| Fidelity Freedom Index 2045 Investor | 0.12 | 7.6 | |
| | | | |
| Fidelity Freedom 2030 | 0.68 | 6.87 | Fails Efficiency Requires 1.2% more return to pass. |
| Fidelity Freedom Index 2030 Investor | 0.12 | 7.34 | |
| | | | |
| Fidelity Freedom 2050 | 0.75 | 6.99 | Fails Efficiency Requires 1.4% more return to pass. |
| Fidelity Freedom Index 2050 Investor | 0.12 | 7.61 | |
| | | | |
| Fidelity Equity-Income | 0.6 | 5.38 | Fails Efficiency Requires 1.87% more return to pass. |
| Vanguard Mega Cap Value Index Instl | 0.06 | 6.87 | |
| | | | |
| MainStay Winslow Large Cap Growth I | 0.74 | 16.02 | Fails Efficiency Requires 1.25% more return to pass. |

[13] Expense ratios are as of 2020.

| Fund Name/Comparator | Exp Ratio[13] | Return (5 Yr.) | Return Deficiency |
|---|---|---|---|
| Vanguard Mega Cap Growth Index Instl | 0.06 | 16.41 | |
| | | | |
| JHancock Disciplined Value Mid Cap A | 1.10 | 3.21 | Fails Efficiency Requires 2.45% more return to pass. |
| Fidelity Low-Priced Stock K | 0.43 | 4.02 | |
| | | | |
| MFS New Discovery R6 | 0.96 | 12.83 | Fails Efficiency Requires 4.26% more return to pass. |
| BNY Mellon Sm/Md Cp Gr Y | 0.64 | 17.50 | |

114.    The comparator funds above belong to the same peer group[14] as the Plan fund. Comparing funds in the same peer group is an industry-standard that allows comparisons to be "apples to apples."   Here, the following data points were used to calculate the Plan fund's efficiency: r-squared, standard deviation, and 5-year return.   The same data points were used on both the active and passive funds to calculate the incremental cost and incremental return and then to determine if the active fund is efficient, less than efficient, or fails efficiency.   Thirteen of the biggest actively managed funds in terms of asset size (including the ones mentioned above) fail efficiency:

---

[14] "Peer group" refers to a group of funds that share similar traits, such as industry sector or size, that lends itself to relative value analysis.  Relative valuation among peers in a group has proven to be efficient and effective, and the use of peer groups is one of the most widely used and accepted methods of equity analysis used by professional analysts.  *See* https://www.investopedia.com/terms/p/peer-group.asp (last visited May 22, 2020).

| Fund |
|---|
| FFFFX $ 75,187,565<br>Fidelity Freedom 2040 |
| FFTHX $ 48,673,332<br>Fidelity Freedom 2035 |
| FFFGX $ 48,239,860<br>Fidelity Freedom 2045 |
| FFFEX $ 44,365,251<br>Fidelity Freedom 2030 |
| FFFHX $ 35,398,274<br>Fidelity Freedom 2050 |
| FEQIX $ 95,212,003<br>Fidelity Equity-Income |
| RPTTX $ 69,688,270<br>T. Rowe Price Diversified Mid Cap Gr |
| MLAIX $ 48,751,066<br>MainStay Large Cap Growth I |
| DODIX $ 41,223,670<br>Dodge & Cox Income |
| JVMAX $ 36,318,155<br>JHancock Disciplined Value Mid Cap A |
| VEXRX $ 31,611,815<br>Vanguard Explorer Adm |

| FPURX $ 27,890,719 Fidelity Puritan |
| MNDKX $ 27,260,662 MFS New Discovery R6 |

115.    The Plan's actively-managed funds charged unjustified fees for the additional reason that all but the following of the above thirteen funds are closet index funds: Mainstay Winslow, Dodge & Cox Income, Vanguard Explorer Adm, and MFS New Discovery.  Closet index funds charge as if they are actively managed but vary little from the index benchmark.  In other words, the investments closely follow the underlying benchmark (what a lower cost index fund does), but they charge actively-managed fund prices.

116.    Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

## C.    Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses

117.    The Plan's recordkeeper during the Class Period was Fidelity Workplace Services, LLC ("Fidelity"). 2018 Auditor Report at 8. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services.  These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[15] processing,

---

[15] Qualified Domestic Relations Order.

preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

118.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

119.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

120.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

121.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee

that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at   http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

122.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

123.    First, they must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

124.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

125.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d at 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

126.     Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to undertake any of the aforementioned steps. For example, as noted above, Fidelity has been the Plan's recordkeeper throughout the Class Period with no change, and there is no evidence Defendants have undertaken an RFP since 2014 in order to compare Fidelity's costs with those of others in the marketplace.  Fidelity's direct compensation for recordkeeping services during the Class Period has been, by any measure, unreasonable.   From 2014 to 2018, according to the Plan's Form 5500, the direct annual recordkeeping and administration per participant fees were as follows:

| Year | Direct Recordkeeping Fees[16] |
|------|-------------------------------|
| 2018 | $119 |

---

[16] Biogen reported a *de minimis* amount as their direct costs on their Form 5500 filings from 2014 to 2018. The amount reported doesn't reflect the true amount of direct costs paid by the Plan. It's believed and therefore averred that Biogen is reporting either a *de minimis* amount or a negative number because it believes the credit issued by Fidelity to the Plan is a credit to direct costs. It's not clear that the revenue credit issued by Fidelity was credited to direct costs.

| 2017 | $100 |
| --- | --- |
| 2016 | $64 |
| 2015 | $53 |
| 2014 | $69 |

127.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.  One data source, the *401k Averages Book* (20th ed. 2020)[17] studies Plan fees for smaller plans, those under $200 million in assets.  Although it studies smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping.  That is because recordkeeping and administrative fees should ***decrease*** as a Plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108.  Thus, the Plan, with a billion dollars in assets and over 6,000 participants throughout the Class Period, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

128.    Looking at the Plan's total compensation for recordkeeping and administrative costs also reveals fiduciary breaches.  The total amount of recordkeeping fees (both through direct and indirect payments) per the Plan's form 5500 throughout the Class Period on a per participant

---

[17] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

annual basis was conservatively above $106 per participant per year, spiking as high as $231 per participant in 2016.

129.   As noted above, some plans pay recordkeepers additional fees on top of direct compensation in the form of revenue sharing, and that was the case with the Plan.  The maximum indirect compensation received by Fidelity for recordkeeping services can be estimated to a reasonable degree of certainty using publicly available information[18] because "revenue sharing' is divvied among all the plan's service providers which "could include but are not limited to recordkeepers, advisors and platform providers."  *401k Averages Book*, at p. 7, Answer to FAQ No. 14.

130.   If all the indirect revenue sharing reported on the Plan's Form 5500 (or a significant portion) were paid to Fidelity then, prior to rebates, if any, the annual per participant recordkeeping fee would have been as follows during the Class Period:

| Year | No. of Participants | Direct Costs | Indirect Costs Through Revenue Sharing | P/P Costs |
|---|---|---|---|---|
| 2018 | 6720 | $802,729 | $2,583,223.98 | $267.10 |
| 2017 | 6489 | $651,446 | $2,468,098.78 | $281.43 |
| 2016 | 6344 | $409,307 | $1,979,902.41 | $182.51 |
| 2015 | 6479 | $348,757 | $1,649,671.45 | $146.91 |
| 2014 | 6166 | $431,154 | $1,598,400.71 | $119.12 |

---

[18] *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

131.     These amounts are clearly unreasonable as they are well above recognized reasonable rates for large plans.[19]

132.     By way of further comparison, a 1998 study conducted by the Department of Labor ("1998 DOL Study") reflected that as the number of participants grows, a plan can negotiate lower recordkeeping fees:[20]

| Number of Participants | Avg. Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

133.     Additionally, as plan asset size increases, so should the cost per participant decrease.  *See* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")  Given that the Plan grew in size both in terms of participants and assets from the end of 2014 to the end of 2018, there should have been a significant decrease in per participant

---

[19] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

[20]     *See*  https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/_retirement/study-of-401k-plan-fees-and-expenses.pdf.  Given the general trend of decreasing recordkeeping fees, the average cost per participant from ***nearly 20 years ago*** cited in the 1998 DOL Study would be much lower today.

recordkeeping and administrative costs, but there was not.  It was quite the opposite with per participant costs at $119 in 2014 and $267 in 2018[21].

134.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

135.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

**D.    Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

136.    The structure of this Plan is rife with potential conflicts of interest because Fidelity and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.  Here, the Plan's Trustee is Fidelity Management Trust Co., and an affiliate of Fidelity, Fidelity Workplace Services, LLC, performs the recordkeeping services for the Plan.

137.    This conflict of interest is laid bare in this case where lower-cost Fidelity mutual funds – materially similar or identical to the Plan's other Fidelity funds (other than in price) – were available but not selected because the higher-cost funds returned more value to Fidelity.

---

[21] Although Fidelity purports to issue a credit due to excessive amounts of revenue sharing realized in the Plan, this credit was inconsequential. It's not clear exactly how or if this credit was applied to participant accounts. However, even if this amount was credited directly, the per participant costs are still astronomical. Even with the application of the credit, the per participant amounts were $149 in 2018, $182 in 2017, $118 in 2016, $93 in 2015 and $49 in 2014.

138.    There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in Fidelity's coffers.

139.    The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Fidelity and its affiliates and ensure that the fees charged by Fidelity and its affiliates were reasonable and in the best interests of the Plan and its participants.   Clearly, Defendants failed this aspect of their fiduciary duties.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Committee)

140.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

141.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

142.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

143.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment

lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to investigate certain collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

144.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

145.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

146.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Biogen and the Board Defendants)

147.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

148.    Biogen and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

149.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

150.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

151.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost collective trust vehicles; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

152.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

153.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

154.    **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.


Dated:  July 14, 2020

**BROOKS & DERENSIS, P.C.**

/s/ *Kimberly M. Saliant .*
Kimberly M. Saillant
BBO #548775
111 Devonshire Street, Suite 800
Boston, MA  02109
Phone:  (857) 259-5200
ksaillant@bdboston.com

**CAPOZZI ADLER, P.C.**

/s/ *Donald R. Reavey .*
Donald R. Reavey, Esquire
(*Motion Pro Hac to be Filed)*
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ *Mark K. Gyandoh .*
Mark K. Gyandoh, Esquire
PA Attorney ID #88587

*(Motion Pro Hac to be Filed)*
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class