**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ )<br>)<br>)<br>**In re Biogen, Inc. ERISA Litigation**  )<br>)<br>)<br>)<br>)<br>_____ ) | <br><br><br><br><br><br>**Case No. 20-cv-11325-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                    **July 22, 2021**

## I.      Introduction

Plaintiffs Sarah Gamble ("Gamble"), David Covington ("Covington"), Tansy Wilkerson ("Wilkerson") and Daisy Santiago ("Santiago") (collectively "Plaintiffs") have filed this lawsuit on behalf of a proposed class against Defendants, Biogen Inc. ("Biogen"), the Board of Directors of Biogen Inc. (the "Board"), the Biogen, Inc. 401(k) Savings Plan Committee (the "Committee") and Does No. 1-10, who are members of the Committee or other fiduciaries of the Plan (collectively, "Defendants") alleging Defendants breached certain of its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et. seq*.   D. 22. Defendants have moved to dismiss.   D. 28.   For the reasons stated below, the Court DENIES in part and ALLOWS in part Defendants' motion to dismiss.

## II.     Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific

1

inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).

## III.    Factual Background

The following summary is based upon the allegations in the complaint, which the Court assumes to be true for the purpose of resolving the motion to dismiss.  Biogen is a global biotechnology company focused on neuroscience research.  D. 22 ¶ 13.  The company sponsors the Biogen, Inc. 401(k) Savings Plan (the "Plan"), a participant-directed 401(k) plan that permits participants to direct the investment of their contributions into various investment options offered by the Plan.  Id. ¶ 21.  The Plan is considered a defined contribution retirement plan, of which the Plaintiffs are former Plan participants.  Id. ¶¶ 2, 9-12.  Biogen is a fiduciary charged with administering the Plan and is responsible for selecting, monitoring and retaining service providers that provide investment, recordkeeping and other administrative services.  Id. ¶¶ 5, 85-86.  Biogen delegates its Plan administration duties to the Committee, id. ¶ 15, and as part of those duties, the Committee is responsible for Plan management and/or authority or control over management or disposition of Plan assets.  .  Id. ¶¶ 5, 14.

During the Class Period of July 14, 2014 to the present, id. ¶ 66, the Plan assets were held in a trust by Fidelity Management Trust Company ("Fidelity"), the Plan Trustee, and all investment

and asset allocations were performed through this trust instrument, id. ¶ 24.  The proposed Class consists of "[a]ll participants and beneficiaries in the [Plan] at any time on or after [the Class Period], including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period."  Id. ¶ 66.

Under the Plan, each participant's account is credited with participant contributions, employer matching contributions and any discretionary contributions and earnings or losses thereon.  Id. ¶ 21.  The Plan then pays its expenses from Plan assets and most administrative expenses are paid by participants as a reduction of invested income.  Id.  Each participant's account is charged with the number of distributions taken and an allocation of administrative expenses.  Id. Plan participants' available investment options include mutual funds and collective investment trusts.  Id.  The Plan lineup also offers the Freedom Funds—a suite of thirteen target date funds, which are investment vehicles that offer an all-in-one retirement solution via a portfolio of underlying funds that gradually become more conservative as the expected target retirement year approaches.  Id. ¶ 26.  Target date funds are "inherently actively managed."  Id.  Allocation shifts, also known as a fund's "glide path," are made over time.  Id.

A.    **Freedom Funds**

The Plan has offered the Fidelity Freedom fund target date suite since at least December 31, 2009.  Id. ¶ 27.  Among its several target date offerings, Fidelity offers a spectrum of Freedom Funds:  the Active suite, which includes riskier and more costly Freedom Funds, and the Index suite, which includes less risky, less costly Freedom Funds.  Id.  The Active suite invests predominately in actively managed Fidelity mutual funds while the Index suite places no assets under active management, instead electing to invest in Fidelity funds that track market indices.  Id. ¶ 28.  In 2013 and 2014, the Active suite underwent a strategy overhaul, authorizing investment

managers to deviate from glide path allocations by ten percent.  Id. ¶¶ 34-35.  The Active suite and most of its components have underperformed compared to the Index suite since the overhaul.  Id. ¶¶ 42-43.  The Active suite experienced $16 billion in net outflows from 2014 to 2018.  Id. ¶ 40. By December 31, 2018, approximately thirty percent of the Plan's assets were invested in the Active suite.  Id. ¶ 30.

Defendants were responsible for crafting the Plan lineup, id. ¶ 27, and played a role in the Plan's Qualified Default Investment Alternative ("QDIA").  Id. ¶ 29.  To aid participants who lack the knowledge or confidence to make investment elections for their retirement assets, a retirement plan can designate one of the investment offerings from its lineup as a QDIA.  Id.  By so doing, participants who do not direct their assets to a specific offering for investment will have all contributions automatically invested in the QDIA.  Id.

At all times during the glide path, the Active suite's top three domestic equity positions were in the Fidelity Series funds, two of which trailed their respective indices over their lifetimes— the Intrinsic Opportunities Fund and the Large Cap Stock Fund.  Id. ¶ 33.  The Intrinsic Opportunities Fund, which is allocated 8.13 percent of the total assets in the 2040-2060 Funds, has missed its benchmark, over its lifetime, by 326 basis points (3.26 percent) on an annualized basis. Id.  Similarly, the Large Cap Stock Fund, which is allocated 7.11 percent of the total assets in the 2040-2060 Funds, has missed its benchmark, over its lifetime, by 357 basis points (3.57 percent) on an annualized basis.  Id.

**B.    Other Mutual Funds and Expense Ratios**

The Mainstay Large Cap Growth Fund Institutional Class underperformed the benchmark set by its investment manager, the Russell 1000 Growth Index, on a rolling five-year annualized basis by as much as -2.30 percent.  Id. ¶¶ 45-46.  By the end of the second quarter of 2020, the

fund had trailed its benchmark over the preceding five years by 44 basis points (0.44 percent), annualized.  Id. ¶ 46.  Defendants did not replace this investment option with a better performing alternative.  Id. ¶ 47.  The Allianz NFJ Small Cap Value Fund Institutional Class was replaced in 2018, having underperformed its benchmark since 2012.  Id. ¶ 48.  By the end of 2016, the Allianz NFJ Small Cap Value Fund trailed the benchmark set by its investment manager, the Russell 2000 Value Index, by 393 basis points (3.93 percent) on a five-year annualized basis.  Id. ¶¶ 48-50.  The Harbor International Fund was similarly replaced following underperformance in 2018, with annualized returns trailing the MSCI EAFE Index, the benchmark set by its investment manager, on an annualized basis over a trailing five-year period "for many consecutive years" prior to its removal.  Id. ¶¶ 51-52.  The MFS New Discovery Fund was added in 2018 after having demonstrated an inability to beat its benchmark under the Russell 2000 Growth Index, the benchmark set by its investment manager, by as much as 3.66 percent over a five-year period.  Id. ¶ 54.

In 2018, at least nineteen of the Plan's thirty-two funds were more expensive than comparable funds found in similarly sized plans according to a 2020 study conducted by Brightscope/ICI.  Id. ¶ 56.  From 2014 to 2018, the Plan paid out investment management fees of 0.49 percent to 0.50 percent of its total assets, id. ¶ 57, paying more for investment management fees than the average total plan expenses of 0.28 percent of similarly sized plans.  Id.  The investment management fee component that the Plan paid during the relevant period was 75 to 79 percent higher than the average total cost for other large plans.  Id.

## IV. Procedural History

Plaintiffs Covington, Wilkerson and Santiago instituted this action on July 14, 2020.  D. 1.  Plaintiff Gamble later filed a similar lawsuit, after which the Court consolidated both actions.  D.

23.   Plaintiffs filed an amended, consolidated complaint, on September 25, 2020.   D. 22. Defendants now have moved to dismiss.  D. 28.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 48. [1]

## V.   Discussion

### A.   <u>Statute of Limitations</u>

ERISA does not contain a statute of limitations.  Accordingly, federal courts are required to borrow the relevant statute of limitations from the forum state.  <u>Island View Residential Treatment Ctr. v. Blue Cross Blue Shield of Mass., Inc.</u>, 548 F.3d 24, 27 (1st Cir. 2008). "Typically, a claim for benefits under an ERISA health plan would be treated by analogy to a contract claim, the benefits contract being the substantive source of the obligation."  <u>Id.</u> Massachusetts law provides a six-year limitations period for contract actions.  Mass. Gen. L. c. 260, § 2.  Defendants assert that the challenged investment options, except for the MFS Fund, were Plan investment options prior to July 14, 2014, six years prior to the filing of the initial complaint in this matter on July 14, 2020. D. 29 at 36.  Plaintiffs' allegations, however, pertain to Defendants ongoing investment in these options once the funds began to underperform and are not limited to when Defendants first selected these funds.   D. 22 ¶ 43 (alleging Defendants breached their fiduciary duty by choosing to "select and retain" the Active suite).   Accordingly, to the extent Plaintiffs challenge the investment fund selections that occurred prior to July 14, 2014, their claims are time-barred.  Plaintiffs' allegations with respect to the continued investment and retention of these funds within the past six years remains valid.

---

[1] The parties filed several motions for leave to file notices of supplemental authority, D. 75; D. 76; D. 77; D. 78, as well as several responses thereto, D. 76; D. 79.  The Court allows these motions and considered them in resolution of the motion to dismiss.

B.      **Standing**

To establish Article III standing, a plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." Thole v. U.S. Bank N.A., __ U.S. __, 140 S. Ct. 1615, 1618 (2020) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  An injury in fact is defined as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560 (footnote omitted) (internal citations and quotation marks omitted).  "But in order to establish standing, a plaintiff does not need to show that her rights have actually been abridged: such a requirement 'would conflate the issue of standing with the merits of the suit.'"  Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 52 (1st Cir. 2014) (quoting Aurora Loan Servs., Inc. v. Craddieth, 442 F.3d 1018, 1024 (7th Cir. 2006)).  A named plaintiff in a putative class action has class standing if he alleges personal injury caused by the defendant and "that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." Leber v. Citigroup 401(k) Plan Inv. Comm., 323 F.R.D. 145, 154 (S.D.N.Y. 2017) ("Leber IV") (quoting NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 162 (2d Cir. 2012)).

Defendants argue that Plaintiffs did not invest in every fund cited in Plaintiffs' complaint— Freedom, MainStay, Allianz, Harbor, MFS, Columbia and T. Rowe Funds, and accordingly, lack standing to challenge these investment options.  D. 29 at 37.  Lawsuits brought under 29 U.S.C. § 1132(a)(2) are "brought in a representative capacity on behalf of the plan as a whole" and remedies under 29 U.S.C. § 1109 "protect the entire plan."  Mass. Mut. Life Ins. Co. v. Russell,

473 U.S. 134, 142 & n.9 (1985). A plaintiff with Article III standing may proceed under 29 U.S.C. § 1132(a)(2) on behalf of the Plan or other participants. See, e.g., Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 593 (8th Cir. 2009) (noting that "a plaintiff may seek relief under § 1132(a)(2) that sweeps beyond his own injury"); Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423 (6th Cir. 1998) (noting that "the standing-related provisions of ERISA were not intended to limit a claimant's right to proceed under Rule 23 on behalf of all individuals affected by the [fiduciary's] challenged conduct, regardless of the representative's lack of participation in all the ERISA-governed plans involved").

Plaintiffs' allegations pertain to a defined-contribution plan. See Thole, 140 S. Ct. at 1619 (noting that "the participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust or to the participants in a defined-contribution plan"). Defendants argue that if Plan fiduciaries selected an imprudent or overpriced investment for inclusion, the decision solely harms those Plan participants who invested their individual account assets in that fund. D. 29 at 37-38; see Patterson v. Morgan Stanley, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *4 (S.D.N.Y. Oct. 7, 2019) (concluding that plaintiffs in putative class action did not have class standing to bring suit for breach of fiduciary duty because they had only invested in six of thirteen funds at issue). "[T]he majority of courts considering similar cases," however, "are consistent with Leber IV," Falberg v. Goldman Sachs Grp., Inc., No. 19-cv-9910 (ER), 2020 WL 3893285, at *8 (S.D.N.Y. July 9, 2020), in which the court found that named plaintiffs, who were participants in a defined contribution plan, had asserted an injury because "plaintiffs can establish constitutional standing to bring representative claims by pointing to injuries to Plan assets." Leber IV, 323 F.R.D. at 156 (holding that "[t]he fact that only some of these alleged losses manifested themselves in the named plaintiffs' individual accounts does not deprive plaintiffs of

their standing to seek redress on behalf of the Plan for the broader injuries the Plan incurred" );

see McDonald v. Edward D. Jones & Co., No. 4:16-cv1346, 2017 WL 372101, at *2 (E.D. Mo.

Jan. 26, 2017) (noting that "[i]n a suit brought pursuant to 29 U.S.C. § 1132(a)(2), a plan

participant may seek recovery for the plan even where the participant did not personally invest in

every one of the funds that caused an injury to the plan"); Taylor v. United Techs. Corp., No. 06-

cv-1494, 2008 WL 2333120, at *3 (D. Conn. June 3, 2008) (noting that "the loss to the Plan assets

due to excessive fees or impaired returns represents a concrete and actual injury to satisfy

standing").

Accordingly, the Court concludes that the named Plaintiffs have asserted an injury in fact,

as they allege that they personally paid excessive fees in connection with their own investments,

thereby establishing injury, see, e.g., Leber IV, 323 F.R.D. at 156, and have asserted a sufficient

claim for class standing given their joint stakes in the litigation.  Id. at 158 (reasoning that "despite

the variations between the Affiliated Funds, investors in all nine funds have the 'same necessary

stake in litigating' whether defendants' conduct amounted to a breach of their fiduciary duties");

Falberg, No. 19-cv-9910 (ER), 2020 WL 3893285, at *8 (noting that "the argument that a named

plaintiff only has constitutional standing where he shares an identical injury with the class

improperly conflates the separate inquiries of Article III standing and Rule 23 class certification").

## C.   **Breach of Fiduciary Duty (Count I)**

Plaintiffs allege that Defendants failed to adequately compare the Active and Index suites,

and further, that the Index suite would have been the clear, superior option, D. 22 ¶ 27, particularly

following the 2014 overhaul, id. ¶ 43, if Defendants had conducted "a simple weighing" of the two

options with "an eye focused solely on the interests of the participants," id. ¶ 27.  A Plan

participant's "benefits can turn on the plan fiduciaries' particular investment decisions."  Thole,

140 S. Ct. at 1618.  Accordingly, ERISA subjects fiduciaries to the "prudent man standard of care," 29 U.S.C. § 1104(a), which requires a fiduciary to discharge his duties "solely in the interest of the [ERISA plan] participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and to do so "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B); see Kenney v. State St. Corp., 694 F. Supp. 2d 67, 73 (D. Mass. 2010).

Pursuant to ERISA, fiduciaries must "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C).  "Since plans are under no duty to offer any particular type or mix of funds, 'ERISA does not require a retirement plan to offer an index fund or a stable value fund, and the failure to include either in the Plan, standing alone, does not violate the duty of prudence.'" Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 211 (D. Mass. 2020) (quoting Wildman v. Am. Century Servs., LLC, 362 F. Supp. 3d 685, 704 (W.D. Mo. 2019)).  An ordinary plan's aims are "(1) to maximize retirement savings for participants while (2) avoiding excessive risk."  Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 420 (2014).  "A plaintiff may survive a motion to dismiss, even absent allegations of the defendant's knowledge or inadequate investigation, if the court can infer 'based on circumstantial factual allegations . . . "that the process was flawed."'"  Falberg, No. 19-cv-9910 (ER), 2020 WL 3893285, at *8 (quoting Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 718 (2d Cir. 2013)).

"[W]hether a fiduciary's actions are prudent cannot be measured in hindsight, whether this hindsight would accrue to the fiduciary's detriment or benefit."  Bendaoud v. Hodgson, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (internal quotations omitted) (quoting DiFelice v. U.S.

Airways, Inc., 497 F.3d 410, 424 (4th Cir. 2007)).  "[P]rudence of the investment option must be evaluated as of the time it was offered to the plaintiff."  Bendaoud, 578 F. Supp. 2d at 271; Fifth Third Bancorp, 573 U.S. at 425 (noting that "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts . . . the appropriate inquiry will necessarily be context specific" (citing 29 U.S.C. § 1104(a)(1)(B))).  Ultimately, although Plan participants "directing their investments in a defined contribution plan must bear some risk of loss . . . fiduciaries may still be held liable 'for assembling an imprudent menu' of investment choices."  Bendaoud, 578 F. Supp. 2d at 271.  To evaluate whether a fiduciary acted prudently, specific to a fiduciary's failure to remove or close a fund, the court must consider whether the fiduciary "'fail[ed] to investigate and evaluate the merits of [their] investment decisions.'"  DiFelice, 497 F.3d at 420.

### 1.   *Duty of Prudence*

#### a)   Retention of the Active Suite

Plaintiffs allege Defendants breached the duty of prudence by continuing to offer the Active suite as an investment option, despite its alleged deficiencies.  D. 22 ¶¶ 42-43.  To demonstrate Defendants' failings, Plaintiffs use the Index suite as a benchmark to demonstrate that the Freedom Funds underperformed.  D. 32 at 17.  Plaintiffs assert that both the Index suite and Active suite were "inherently actively managed," D. 22 ¶ 26, and that the Index suite is consequently a "meaningful, if not ideal, benchmark for the Active Suite," as they are both offered by the same investment management firm, are readily available as a Plan investment option, share the same management team and share almost identical glide paths.  D. 32 at 17-18; D. 22 ¶¶ 28, 34.  Plaintiffs allege the key distinction between the two suites is the management team's discretion to select riskier and actively managed assets and to deviate from the glide path for the Active suite,

D. 22 ¶¶ 31, 37, 39-40, thereby indicating that "the Index Suite is the control and the Active Suite is the variable—any outperformance or underperformance by the Active suite relative to the Index Suite is directly related to the fee differential."  D. 32 at 18; D. 22 ¶¶ 37-38, 44.  Plaintiffs also argue that their reliance on three- and five-year performance data to assess underperformance is proper for benchmarking purposes, because they "encompass a period closer to a full market cycle."  D. 22 ¶ 42.  Plaintiffs further contend that the three- to five- year performance comparison is particularly relevant given the Active suite's strategy overhaul in 2013 and 2014, which authorized investment managers to deviate from glide path allocations by 10 percent and allegedly expose assets to market fluctuations and volatility, id. ¶¶ 34-35, thereby rendering performance comparisons before the overhaul irrelevant.  D. 32 at 20.

Defendants dispute the validity of Plaintiffs' benchmark selection, as well as its use of the three- to five- year bracket for performance comparisons.  D. 29 at 12-14.  Disputes over the appropriateness of these benchmarks, however, are inappropriate at the motion to dismiss stage. Cunningham v. Cornell Univ., No. 16-cv-6525 (PKC), 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017) (noting that defendants' arguments that plaintiffs used "inappropriate benchmarks to assess the performance of the challenged options" raised "factual questions that [were] not properly addressed on a motion to dismiss" (citing Sacerdote v. New York Univ., No. 16-cv-6284 (KBF), 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017))).  The crux of Plaintiffs' allegation is that the Active suite has "substantially underperformed the Index Suite" since the 2013 and 2014 overhaul, D. 22 ¶ 42, and is known to the investing public at-large as an irresponsible investment choice.  Id. ¶ 40.  Plaintiffs cite a 2018 Reuters report, which notes that many investors lost confidence in the Active suite "because of [its] history of underperformance, frequent strategy changes and rising risk."  Id. ¶ 35.  The same report also notes that, according to the President of

Target Date Solutions, while many target date fund managers increased exposure to riskier investments "in an effort to augment performance by taking on additional risk," the Active suite went "further down this path than its peers." Id.

Under the prudent man rule, the courts must assess a fiduciary's prudence based on the fiduciary's conduct, rather than "the result of performance," and viewed from the perspective of the time of the challenged decision. Barchock v. CVS Health Corp., 886 F.3d 43, 44 (1st Cir. 2018) (quoting Bunch v. W.R. Grace & Co., 555 F.3d 1, 7 (1st Cir. 2009)). Here, Plaintiffs' allegations support a plausible claim that a prudent person who knew what Defendants knew would have stopped utilizing the Active suite in the aftermath of Fidelity's strategy overhaul in 2014. Plaintiffs assert that in 2018, the Active suite experienced an estimated $5.4 billion in net outflows with nearly $16 billion withdrawn from the fund family over the previous four years. D. 22 ¶ 40. Based on the Freedom suite's performance on a trailing three- and five- year annualized basis following the 2013 and 2014 overhaul, id. ¶¶ 42-43, the 2018 Reuters report, id. ¶ 35, and reports from Morningstar, id., Defendants plausibly knew about the 'pitfalls' of the Active suite, given its publicity, and did not meet the objective prudent person standard by continuing to offer said suite, id. ¶¶ 35-36.

Defendants argue Plaintiffs' complaint fails to show that the Reuters report's concerns "panned out" after its 2018 publication, D. 36 at 11, and that the core of Plaintiffs' argument rests on whether the Freedom Funds were "unsuitably risky," id. at 10. Defendants argue "one negative review does not support an inference of imprudence, even at the pleading stage," D. 36 at 11 n.8, particularly where "the Freedom Funds are industry-leading, well-ranked products selected by thousands of other defined contribution plans sponsors and fiduciaries," D. 29 at 21 (internal citations omitted); see Patterson, 2019 WL 4934834, at *14 (noting that plaintiff's reliance on

Morningstar ratings was "deficient," and "the mere fact that Vanguard's 2025 Retirement Trust had a higher rating than the 2025 Trust in no way tends to show that the 2025 Trust was not a suitable investment") (citing Meiners v. Wells Fargo & Co., 898 F.3d 820, 823 (8th Cir. 2018) (noting that "[n]o authority requires a fiduciary to pick the best performing fund")).  In addition, the period at issue includes some instances in which  the Active suite outperformed the Index suite. See  D. 22 ¶ 42 (noting that the Index suite outperformed the Active suite in four of six calendar years).  Standing alone, "[m]ixed performance is insufficient to state a claim that Defendants abdicated their duties by including" the Freedom Funds in the Plan.  Patterson, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *13.

Plaintiffs do not base their claim, however, in Defendants' initial investment in the Freedom Funds or irregular performance alone.  See Roth v. Sawyer–Cleator Lumber Co., 16 F.3d 915, 917–18 (8th Cir. 1994).  Rather, their claim is rooted in Defendants' continued investment and failure to remove the Freedom Funds following its consistent underperformance after the strategy overhaul in 2013 and 2014.  D. 22 ¶ 42.  One of a fiduciary's obligations is the "continuing duty to monitor trust investments and remove imprudent ones," Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015).  Plaintiffs not only allege that the Active suite underperformed compared to the Index suite, but also that it received widespread criticism—thereby alerting fiduciaries to its pitfalls—and experienced an estimated net outflow of $5.4 billion in 2018, with nearly $16 billion withdrawn from the fund family over the prior four years.  D. 22 ¶ 40.  While Defendants allege these factual allegations are inadequate given the Freedom Fund's historic reputation and inherent volatility, the Court concludes Plaintiffs have asserted sufficient factual allegations to plausibly state a claim to relief under Count I of their amended complaint with respect to Defendants' continued retention of the Active suite and declines to dismiss such claim.  See In re Quest

14

Diagnostics Inc. ERISA Litig., No. 20-cv-07936-SDW-LDW, 2021 WL 1783274, at *3 n.5 (D.N.J. May 4, 2021) (denying motion to dismiss on grounds that "taken together, [plaintiffs'] allegations would amount to a real-time warning that prudent fiduciaries must adjust the Plan's Investment Menu, fee structure, or management"); In re MedStar ERISA Litig., No. RDB-20-cv-1984, 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021) (denying motion to dismiss given that "[p]laintiffs have not only alleged that the Active suite underperformed in comparison to the Index suite, but also that the Active suite saw an outflow of investment as well as received criticism from different financial news and reporting services"); cf. Barchock, 886 F.3d at 53 (concluding plaintiffs' provision of industry survey statistics, which merely showed that the fund manager "charted a relatively more 'cash'-focused course than most of the funds that were surveyed," was, standing alone, inadequate to support a claim that such decision-making was imprudent); Wehner v.Genentech, Inc., No. 20-cv-06894-WHO, 2021 WL 2417098, at *9 (N.D. Cal. June 14, 2021) (concluding plaintiff's "barebones comparison" of investment funds was inadequate to support imprudence claim as compared to out-of-circuit cases in which plaintiffs had "based their claim for imprudence on numerous other grounds").

      b)      Retention of the Mainstay Large Cap Growth, Allianz NFJ Small Cap Value, Harbor International, MFS New Discovery Funds

To state a claim that a fiduciary violated its duties under ERISA, "the plaintiff must allege facts establishing that the fiduciary's investment decisions—in the conditions prevailing at the time, and without the benefit of hindsight—are such that a reasonably prudent fiduciary would not have made that decision as part of a prudent, whole-portfolio, investment strategy that properly balances risk and reward, as well as short-term and long-term performance." Birse v. CenturyLink, Inc., No. 17-cv-02872-CMA-NYW, 2019 WL 1292861, at *3 (D. Colo. Mar. 20, 2019); Pension Benefit Guar. Corp., 712 F.3d at 716.  Courts must consider whether fiduciaries "at the time they

engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co., 259 F.3d 1036, 1043 (9th Cir. 2001) (internal quotation marks and citations omitted); see Pension Benefit Guar. Corp., 712 F.3d at 716 (noting that "ERISA's fiduciary duty of care . . . requires prudence, not prescience") (quotation marks omitted).  However, although fiduciaries must exercise care in "selecting investments at the outset," they also have "a continuing duty of some kind to monitor investments and remove imprudent ones." Tibble, 575 U.S. at 529-530.

Here, Plaintiffs allege that MainStay, Allianz, Harbor and MFS Funds underperformed and that each should have either been removed or removed earlier than they were.  D. 22 ¶¶ 44-55. Plaintiffs counter Defendants' assertion that MainStay earned double digit returns for most of the relevant five-year period.  D. 30-21.  They argue Defendants' assertion ignores that the returns of MainStay's benchmark significantly exceeded the fund's returns, "suggesting that the fund's presence in the Plan lineup was depriving participants of significant asset growth."  D. 32 at 26. Defendants argue MainStay's retention was consistent with the fiduciaries' focus on long-term goals, which is deemed a rational strategy for retirement plans.  Birse, 2019 WL 1292861, at *3. Plaintiffs assert that the differential in performance, given the magnitude of the Plan, are in fact significant., noting that "if $100 million were placed into the fund, the Plan would have lost out on more than $19 million in growth over the five-year period ended December 31, 2016 compared to the alternative where the Plan invested in a fund that tracked Mainstay fund's benchmark."  D. 32 at 27.

As to the Allianz and Harbor Funds, which Plaintiffs allege were removed in 2018 but should have been removed sooner, underperformed their benchmarks, with their five-year returns

outperforming their benchmarks near the start of the period and beginning to trial benchmarks leading up to their removal.  D. 30-21.  Similar to their arguments for MainStay, Plaintiffs assert that "if $100 million were placed into the Allianz and Harbor funds, the Plan would have lost out on more than $32 million and $10 million, respectively, over the five-year period ended December 31, 2016—two years before each fund was removed from the Plan—compared to the alternative where the Plan invested in funds that tracked the Allianz and Harbor funds' respective benchmarks."  D. 32 at 27.  As to the MFS Fund, Plaintiffs also contend that it trailed the Fund's benchmarks leading up to its selection, to which Defendants counter that it outperformed its benchmark on a ten-year basis at the end of 2018, D. 30-21, and was awarded as a silver medalist by Morningstar on a forward-looking basis, D. 29 at 29 n.22.  Plaintiffs argue MFS Funds "should not have been added to the Plan lineup, as it demonstrated a consistent inability to beat its benchmark, the Russell 2000 Growth Index, over a 5-year period, for the four years preceding its [ ] selection."  D. 32 at 28.

"[C]ourts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct."  Pension Benefit Guar. Corp., 712 F.3d at 719 (internal quotations omitted) (quoting N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC, 709 F.3d 109, 121 (2d Cir. 2013)); Johnson v. Fujitsu Tech. and Bus. of Am., Inc., 250 F. Supp. 3d 460, 466 (N.D. Cal. 2017) (concluding that allegation that the fiduciary breached its duties by "failing to promptly remove imprudent investments and the target-date funds more broadly when it was apparent that each was imprudent" was plausibly pled).  Here, Plaintiffs allege that the specified Funds underperformed either preceding or following their selection, and that a prudent fiduciary would have removed said funds or removed them earlier.  They present sufficient circumstantial evidence to indicate that Defendants may have erred.  Falberg, No. 19-

cv-9910 (ER), 2020 WL 3893285, at *8.  Accordingly, Defendants' motion to dismiss Plaintiffs' breach of the duty of prudence claims with respect to MainStay, Allianz, Harbor and MFS Funds also is denied.

c)      <u>Whether Plan's Investment Menu Is Excessively Expensive</u>

Plaintiffs allege that the Plan's investment menu is overpriced when compared to similarly sized plans.  D. 22 ¶¶ 56-59.  "[M]erely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach."  <u>Marks v. Trader Joe's Co.</u>, No. 19-cv-10942 PA (JEMx), 2020 WL 2504333, at *7 (C.D. Cal. Apr. 24, 2020) (internal quotations omitted) (quoting <u>White v. Chevron Corp.</u>, No. 16-cv-0793-PJH, 2017 WL 2352137, at *14 (N.D. Cal. May 13, 2017)); <u>see</u> <u>Hecker v. Deere & Co.</u>, 556 F.3d 575, 586 (7th Cir. 2009) (concluding that employer did not breach fiduciary duty to employees by selecting investment options with excessive fees as employees could have chosen from wide range of expense ratios among twenty offered mutual funds).  "Nothing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  <u>Id.</u> "[T]he range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured."  <u>Renfro v. Unisys Corp.</u>, 671 F.3d 314, 327 (3d Cir. 2011).  "Showing that any given [ ] Fund had cheaper alternatives or that it had unreasonably excessive fees," however, "may allow a trier of fact to 'reasonably infer . . . that the [defendants'] process was flawed,' [though] it is not dispositive of the ultimate question regarding the 'methods employed by the ERISA fiduciary' to investigate, select, or monitor investments."  <u>Leber IV</u>, 323 F.R.D. at 157.

Here, Plaintiffs allege that the Plan "failed to utilize its massive size to negotiate for cheaper share classes for two of the Plan's funds: the Mainstay Large Cap Growth Fund Class I and T. Rowe Price Diversified Mid Cap Growth Fund." D. 32 at 29 (citing D. 22 ¶ 58). They also allege that from 2014 to 2018, the Plan paid out investment management fees of 0.49 to 0.50 percent of its total assets, which was also "considerably more than those of comparable plans." D. 22 ¶ 57. According to Plaintiffs' cited Brightscope/ICI study, the average Total Plan Cost ("TPC") for a plan with over $1 billion in assets in 2017 was 0.28 percent of total assets, with investment management fees comprising just one component of the TPC. Id. In contrast, the investment management fee component that the Plan allegedly paid during the relevant period was 75 to 79 percent higher than the average total cost for other large plans. Id. Plaintiffs allege the circumstantial evidence of this study supports their argument that Defendants breached their fiduciary duty by not leveraging their power and size to obtain cheaper share classes. D. 32 at 28-29.

For an investment-by-investment challenge, "a complaint cannot simply make a bare allegation that costs are too high, or returns are too low," but instead "must provide a sound basis for comparison—a meaningful benchmark." Davis v. Washington Univ. in St. Louis, 960 F.3d 478, 484 (8th Cir. 2020) (noting that "[p]lausibility depends on the 'totality of the specific allegations in [each] case'" (quoting Braden, 588 F.3d at 596 n.7)). Here, Plaintiffs' allegations go sufficiently beyond the bare allegation that they deemed the costs of "two specific funds" to be too high. D. 26 at 19; cf. Marks, 2020 WL 2504333, at *7 (concluding Plaintiffs' allegations were insufficient where they solely alleged the company had failed to leverage its "tremendous bargaining power to benefit participants and beneficiaries," and instead, "chose inappropriate, higher cost mutual fund share classes"). Plaintiffs allege that the majority of the Plan's funds in

2018, at least nineteen out of the Plan's thirty-two funds, were more expensive than comparable funds according to a 2020 Brightscope/ICI study, D. 22 ¶ 56, and that the investment management fee component the Plan paid during the relevant period was 75 to 79 percent higher than the average total cost for other large plans, id. ¶ 57.

On a motion to dismiss, the Court must draw every reasonable inference in favor of the plaintiffs.  Lucey v. Prudential Ins. Co. of Am., 783 F. Supp. 2d 207, 211 (D. Mass. 2011). Defendants argue that the cited price differences are "*de minimis* differences of .37 percent to .62 percent between the ICI median fees and the challenged investment options' actual fees."  D. 29 at 30.  They also note that the Freedom Funds' expense ratios dropped by up to .08 percent between 2014 and 2019, id. at 14, and the Committee moved the Columbia Dividend Income Fund to a new share class, saving participants .06 percent, and switched from the Harbor International Fund to the American Funds EuroPacific Growth Fund, saving participants .32 percent.  D. 29 at 33. Viewing the complaint in Plaintiffs' favor, however, Plaintiffs' allegations are at least sufficient to suggest Defendants breached their fiduciary duty by failing to satisfactorily monitor and lower cost share classes and the motion to dismiss with respect to this claim  is denied.  See Velazquez v. Mass. Fin. Sevs. Co., 320 F. Supp. 3d 252, 259 (D. Mass. 2018) (noting that "[a] claim of breach is sufficiently made out, however, when a plaintiff plausibly alleges that the higher fees were unjustified or otherwise improper");  Cunningham, 2017 WL 4358769, at *8 (noting that "to the extent plaintiffs claim that defendants breached their fiduciary duties by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds . . ., these allegations are sufficient to survive the motions to dismiss").

2.      *Duty of Loyalty*

Plaintiffs allege Defendants violated their duty of loyalty by selecting and retaining the challenged investments.  D. 22 ¶ 25.  ERISA's duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  "Under the common law of trusts, the duty of loyalty prohibits a fiduciary from 'engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests . . . ."  Velazquez, 320 F. Supp. 3d at 259 (quoting Patterson v. Cap. Grp. Cos., Inc., No. 17-cv-4399, 2018 WL 748104, at *4 (C.D. Cal. Jan. 23, 2018)).

Here, Plaintiffs claim Defendants allowed Fidelity to charge excessive management fees that go "straight into Fidelity's pockets."  D. 22 ¶ 39.  Plaintiffs fail, however, to allege any imprudent conduct.  Cf. Velazquez, 320 F. Supp. 3d at 260 (holding allegations that defendants not only collected excessive fees for high-cost proprietary funds but also failed to shed those funds in favor of cheaper similar alternatives because to do so would have cost them their profits was sufficient state a breach of fiduciary duty claim); Johnson v. Fujitsu Tech. & Bus. of Am., Inc., 250 F. Supp. 3d 460, 467 (N.D. Cal. 2017) (finding facts alleged sufficient to establish plausible claim where plaintiffs allege the Plan "was the most expensive 'mega plan' in the country, . . . with expenses three times higher than average for similarly-sized plans . . ., and [ ] recordkeeping expenses were five to ten times higher than fees for similarly-sized plans").  The inclusion of Fidelity-managed options does not give rise to an inference of disloyalty standing on its own, particularly given that two-thirds of the plan's investment options offered during the Class Period were non-Fidelity funds.  See D. 30-10, D. 30-11, D. 30-2; see Tracey v. Mass. Inst. of Tech., No. 16-cv-11620-NMG, 2017 WL 4453541, at *13 (D. Mass. Aug. 31, 2017), report and

21

recommendation adopted in part, rejected in part, No. 16-cv-11620-NMG, 2017 WL 4478239 (D. Mass. Oct. 4, 2017) (dismissing duty of loyalty claims where defendants "included more than 150 non-Fidelity investment options to compete with those 180 Plan options that were offered by Fidelity").  The allegation that the Freedom Funds were offered solely to generate funds for Fidelity, without more, is merely conclusory and does "not 'give rise to a plausible inference that Defendants' concern about the stock price was self-serving.'"  Kopp v. Klein, 894 F.3d 214, 221-22 (5th Cir. 2018) (noting that Plaintiffs ask the court "to infer that the Defendants acted with inappropriate motivations because they stood to gain financially from [the Fund's] success," but "the potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty"); cf. Terraza v. Safeway Inc., 241 F. Supp. 3d 1057, 1071 (N.D. Cal. 2017) (denying motion to dismiss duty of loyalty claims where plaintiffs alleged "an obviously profound conflict-of-interest," claiming that Plan investments were "significantly influenced" by a trustee of the Plan).  Accordingly, the Court dismisses Plaintiffs' duty of loyalty claim.

## D. **Failure to Monitor Fiduciaries or Co-Fiduciary Breaches (Count II)**

Plaintiffs also allege that Biogen failed in its fiduciary responsibility to monitor the performance of the Committee and its members and that Biogen and its Administrative Committee failed in its fiduciary responsibility to monitor the performance of Committee members.  D. 22 ¶ 86.  Plaintiffs allege they breached their duty to monitor by:  (a) failing to monitor and evaluate the performance of their appointees or have a system in place for doing so; (b) failing to monitor their appointees' fiduciary processes; and (c) failing to remove appointees whose performances were inadequate.  Id. ¶ 89.

"Fiduciaries have an ongoing duty to monitor individual investment options to ensure that they remain prudent."  Bendaoud, 578 F. Supp. 2d at 271.  "[T]o plausibly establish a claim for a

breach of duty to monitor, a plaintiff must allege facts plausibly establishing that no reasonable fiduciary would have maintained the investment." Birse, 2019 WL 1292861, at *4. "Those facts must support the conclusion that the defendants would have acted differently had they engaged in proper monitoring—and that an alternative course of action could have prevented the plan's losses." Id. To the extent that plaintiffs have plausibly alleged that defendants breached their fiduciary duties directly, plaintiffs have also plausibly alleged that defendants have breached their duty to monitor." Tracey, 2017 WL 4478239, at *4 (noting that "ordinarily, a duty to monitor other fiduciaries is derivative of plaintiffs' other claims"). Given the Court's preceding analysis regarding the duty of prudence claim, the Court denies Defendants' motion to dismiss Plaintiffs' duty to monitor claim.

###### E.    Liability for Knowing Breach of Trust (Count III)

Plaintiffs allege, in the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, that each such Defendant be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust. D. 22 ¶¶ 93-95. Defendants argue that because there is no predicate basis for these derivative claims, and because Plaintiffs failed to plead facts to support this claim, Count III should be dismissed. D. 29 at 35-36. Given that the Court has assumed as alleged that Defendants are fiduciaries and certain of the breach of fiduciary duty claims survive, the Court concludes that dismissal of this alternate theory under Count III at this juncture is not warranted.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES in part and ALLOWS in part Defendants' motion to dismiss. The motion to dismiss is denied as to Plaintiffs' breach of fiduciary duty insofar as it alleges breach of the duty of prudence (Count I) and duty to monitor (Count II), D. 28, but is

allowed as to the breach of fiduciary duty claim insofar as it alleges breach of the duty of loyalty (Count I).  The Court DENIES Defendants' motion to dismiss as to Plaintiffs' alternative liability for knowing breach of trust claim (Count III) without prejudice.

> **So Ordered.**

/s/ Denise J. Casper
United States District Judge